ROBERT WALKER, ADMINISTRATOR, ETC., v. THE LAKE
SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY.

*Master and servant—Railroad companies—Negligence—Death of*
*employé—Scope of employment—Apparent danger—*
*Fellow-servants—Evidence—Damages—*
*Instructions to jury—Pleading.*

In a suit against a railway company for negligence resulting in
the death of one of its section foremen, it appeared that, act-
ing under the special instructions of the road-master of a
division of the defendant's road to cut a trolley wire which a
street-railway company had strung over defendant's track, the
decedent climbed upon a box car, which had been run under-
neath the wire, and, while standing upon a stepladder which
he had placed on top of the car, drew the wire down by
placing one arm over it, and, with a pair of nippers, cut it
until it parted, and, by force of the recoil, threw him to the
ground and caused his death.    It further appeared that the
wire was about one-third of an inch in diameter; that it was
stretched across the track at a tension of about 2,000 pounds;
that its breaking strength was about 3,000 pounds; that the
outer portion of the wire was copper, while the inside was
soft.

1. Mr. Justice MONTGOMERY filed an opinion, concurred in by
McGRATH, C. J., holding:

   *a*—That the contention of the defendant that the road-
master and the decedent were fellow-servants, and that, there-
fore, the instructions given by the road-master, if they led
the decedent into danger, were the instructions of a fellow-
servant, for which the defendant is not liable, cannot be up-
held; that, in determining whether a servant is called upon
to do work outside of the scope of his employment, the ques-
tion does not turn upon that of whether the master would be
liable for the personal negligence of a superior servant; that
it becomes a question of authority, and, if one having author-
ity over the servant directs him to do an act outside of the
scope of his employment, the servant, in its performance,
assumes the risk only of such danger as is apparent; that in
order to bring the injured servant within the protection of
the rule that, when called upon to perform a service outside
of the scope of his employment, the master owes the duty of

warning him against all dangers, except those which are obvious to a person of his capacity, skill, and experience, it is not necessary that the order to engage in the outside service be given by the *alter ego* of the master, but it is enough if the superior servant has, in this respect, *controlling* authority; citing *Railway Co. v. Bayfield*, 37 Mich. 212; *Jones v. Railway Co.*, 49 Id. 573.

*b*—That it cannot be held, as matter of law, that the danger was as apparent to the decedent as it was to any one, and that, therefore, in consenting to engage in this work without objection, the decedent assumed the risk of the employment,— it appearing that the decedent was wholly unskilled in the work, and that trolley wires were new in the city where the work was done, and it not being shown that the decedent knew anything about the amount of tension which the wire was sustaining, or the probable result of cutting the wire in the manner in which it was cut, and it further appearing that the work was done under the eye of one of the defendant's linemen, and that the decedent was given no warning,—but that, under the circumstances, it was a question for the jury as to whether the danger was obvious to the decedent; citing *Smith v. Car Works*, 60 Mich. 501.

*c*—That it was competent on the cross-examination of the road-master, who had been sworn as a witness for the plaintiff, to ask him if he ever instructed the decedent to cut the wire, and whether he ever stated to the decedent or requested him to cut the wire.

*d*—That it was competent to ask the same witness, on his cross-examination, as bearing upon the question whether the removal of the obstruction caused by the stringing of the wire was within the line of the decedent's duties as section foreman, how high above the top of one of the high cars an ordinary man's lantern would be when giving certain signals, and if the witness was able to state whether, if the brakeman, an ordinary sized man, happened to be on one of the high cars, and was required to give and did give a certain signal, which had been described to the jury, his lantern would go as high as 22 feet.

*e*—That it was error for the court, after stating to the jury that they were at liberty to take into account the *data* furnished by the proof consisting of the earnings of the decedent and his life expectancy, and to determine the amount which he would probably have contributed to the family if he had lived, to instruct them further that they were not bound to award any particular, fixed, and definite sum as the exact product of figures based upon such life expectancy, and the

life expectancy of decedent's wife, and the period of the minority of his children, and that these figures were given to the jury to enable them to have an intelligible basis for their computation, and not as an absolute rule which they must follow in arriving at a verdict in case they should award damages to the plaintiff, but that they should, however, take such figures into account in making up their verdict, in order that they might not render a verdict for an excessive amount; there being no testimony in the case which would furnish a basis for any other damages than the loss of such contributions to support as the decedent would have been able to make from his earnings, which fact the jury evidently disregarded, and reached the result evidenced by their verdict without any computation, and the Court not being prepared to say that the jury may not have construed the language so used as authorizing them to do so.[1]

*f*—That the declaration is defective in not stating the facts as to the existence of the wife and children of the decedent, who would be entitled to damages by reason of his death; citing *Hurst v. Railway Co.*, 84 Mich. 539; *Charlebois v. Railroad Co.*, 91 Id. 59.

2. Mr. Justice GRANT filed an opinion, in which he concurred with Mr. Justice MONTGOMERY on the question of damages, but held that there was no evidence in the case on which to base a charge of negligence against the defendant, and that the judgment should be reversed, and no new trial ordered.

3. Mr. Justice HOOKER filed an opinion in which he concurred in the reversal of the judgment, coupled with an order for a new trial, and held that it was a question for the jury to determine whether the service performed by the decedent was of so extraordinary a character, involving latent danger, as to impose upon the defendant the duty of warning the decedent, if defendant was aware of the danger, and whether the defendant was negligent in failing to discover and warn the decedent of such danger, if it existed.

Error to Kalamazoo. (Buck, J.) Argued January 11, 1895. Decided April 16, 1895.

---

[1] Decedent was 40 years old at the time of his death. He was receiving $46 per month, and left a widow whose life expectancy was 31 years, and three children, aged, respectively, 15, 13, and 9 years. Plaintiff recovered a verdict for $7,000.

Negligence case. Defendant brings error. Reversed. The facts are stated in the opinions.

*Boudeman & Adams* and *C. E. Weaver,* for appellant.

*Osborn, Mills & Master (E. S. Roos,* of counsel), for plaintiff.

MONTGOMERY, J. This action is instituted to recover damages sustained by the wife and children of deceased by his death, which is alleged to have occurred through the negligent fault of defendant.

Deceased had been in the employ of defendant company for some time as a section boss. His duties were to maintain his section of track, and keep it in good repair for the safe passage of trains and traffic on the road generally. Henry H. Houghton was the road-master of the Kalamazoo Division of defendant's road, having headquarters at Kalamazoo, and was the superior of deceased. Some time prior to April 11, 1893, the officers of defendant had been informed that the Citizens' Street-Railway Company, a corporation having a franchise from the city of Kalamazoo to occupy certain of its streets with an electric railway, was about to cross its track on East Main street with rails for street cars, and was about to stretch across the track a trolley wire. On that date the engineer of the company wrote to Mr. Houghton as follows:

"Replying to yours of the 8th inst., in regard to street-railway crossing at Kalamazoo, we do not want them to cross us unless with frogs approved by us, and after a regular agreement has been signed. We want you to stop them at any cost until you get word from this office."

Later, on the 21st of April, the engineer again wrote Mr. Houghton:

"We shall insist upon their signing a regular agreement for the putting in of the crossing over us, and the putting

104 MICH.— 39.

up of the trolley wires.   We shall insist also that they
maintain wires at a height of 23 feet above us, instead of
22 feet.      *      *·      *      We want you to do the best you
can to keep them from either putting up their wires or
laying their railroad across our right of way until an agree-
ment is signed.      *      *      *      I have written Mr. Handy
to find out if he wishes the matter placed in the hands of
an attorney to obstruct by legal proceedings, and will
advise you later.   In the meantime, as I say, I want you
to do everything in your power to prevent the crossing;
and, if we have an attorney at Kalamazoo that you can
call on, you might do it, and act under his advice in the
way of obstructing.   I do not know whether we have one
there or not, however."

On the morning of the 26th of April, Mr. Houghton
discovered that the street-railway company had strung its
trolley wire over the track.   The evidence shows that be-
fore this time he had had some talk with Mr. Walker, the
deceased, with reference to preventing the placing of the
trolley wire over the track.   There was testimony from
which the jury might have properly inferred and did infer
and find that deceased, in what he did thereafter, was
acting under the instructions and special orders of Hough-
ton.   The manner in which the death of Mr. Walker was
occasioned is as follows:   A box car was run underneath
the wire.   The deceased climbed upon the car, and, taking
with him a stepladder, which was placed on top of the
car, stepped up one or two steps, and drew the wire down,
throwing one arm over it, and, with a pair of nippers, cut
it until it parted, and, by force of the recoil, threw him
from the car to the ground, some 16 feet from the car,
causing his death.   The evidence showed that the wire
was about one-third of an inch in diameter, and its break-
ing strength was about 3,000 pounds; that the outer por-
tion of the wire was copper, while the inside or core was
soft.   The wire was stretched across the track at a tension
of about 2,000 pounds.   The evidence showed that deceased

was wholly inexperienced in such work, and that no warning or information of the danger to be apprehended was given, except that Mr. Secord, one of the linemen of defendant, told him to hold the nippers loosely in his hand. There was also testimony tending to show that, while the appliances which were used by the deceased were proper when used in connection with other appliances, when used alone they were improper and insufficient; that proper appliances would include blocks and falls, with heavy halter clamps, on either side of the place to be opened or cut, so that the slack may be pulled together, and the tension let off slowly and gradually.

The case was submitted to the jury, under instructions substantially as follows: That, if the work of removing the obstruction by cutting the wire was within the line of deceased's duty as section boss, plaintiff could not recover; also, that if Walker, the deceased, not being required or requested by any one to do the work of cutting the wire, volunteered to do so, and the accident which resulted in his death was brought about by his inattention to the instructions given him by Mr. Secord, and his want of due care and caution, plaintiff could not recover; and, further:

"If the cutting of the wire in question was not one of the duties of John Walker as section foreman, but he volunteered to do it, without any request being made by any one that he should do it, and in doing it he was injured, because of the manner in which he did the work, then the defendant is not liable in this case to his estate."

On the other hand, the jury were instructed, in substance, that if they found that deceased was an inexperienced man in the business, and did not appreciate or understand the danger to be apprehended from the work in which he was engaged, and if the defendant knew that he was inexperienced in such work, and did not give him sufficient instructions and directions as to the manner of

cutting and removing the wire, or inform him of the danger which he would run in cutting the same, and did not provide for the proper control and holding of the trolley wire or support of the stepladder while he was engaged in cutting the wire, and if deceased was thrown down and met with his death without negligence on his own part, and in consequence of the negligence of defendant, and if deceased was ordered and directed to cut the wire, and was supplied with the nippers and pliers for that purpose, then the plaintiff was entitled to a verdict. With these instructions, and appropriate definitions of the term "negligence," and other specific instructions requested, the case was left to the jury, and a verdict was found in favor of the plaintiff.

It is insisted by the defendant that Houghton and Walker were fellow-servants, and that, therefore, the instructions given by Houghton to Walker, if they led him into danger, were the instructions of a fellow-servant, for which the company is not liable. But we think this contention cannot be upheld. In determining whether a servant is called upon to do work outside the scope of his employment, the question does not turn upon that of whether the master would be liable for the personal negligence of a superior servant. It becomes a question of authority, and, if one having authority over the servant directs him to do an act outside the scope of his employment, the servant, in the performance of such outside work, assumes the risk only if such danger is apparent. As is said in Bailey on Master's Liability (page 221):

"The same duty rests upon the master as to warning and instruction as to duties within the scope of the employment, but, as to temporary work outside of the employment, the same presumption does not apply, to wit, 'that he [the servant] is competent to perform the duties of the position which he seeks, and competent to apprehend and avoid all dangers that may be discovered by

ordinary care.' However, he is presumed to know and comprehend obvious dangers, which require no skill or experience to appreciate, or such obvious dangers as the skill and experience he may have ought reasonably to charge him with. If, therefore, a common laborer who attempts to perform a hazardous service temporarily, outside of his employment, upon request of the master, though not objecting, is injured while performing such duty, his apparent consent alone will not defeat his right of recovery, though the danger is apparent to a person possessed of skill, but not to a common laborer."

See, also, *Railway Co. v. Adams*, 105 Ind. 165; *Ferren v. Railroad Co.*, 143 Mass. 197; *Kain v. Smith*, 89 N. Y. 375; *Mann v. Print Works*, 11 R. I. 152; *Paule v. Mining Co.*, 80 Wis. 356. In order to bring the injured servant within the protection of the rule that, when called upon to perform a service outside of the scope of his employment, the master owes the duty of warning him against all dangers, except those which are obvious to a person of his capacity, skill, and experience, it is not necessary that the order to engage in outside service be given by the *alter ego* of the defendant. It is enough if the superior servant have, in this respect, controlling authority. *Chicago & N. W. Ry. Co. v. Bayfield*, 37 Mich. 212; *Jones v. Railway Co.*, 49 Id. 573.

It is further insisted that the danger was as apparent to the deceased as it was to any one, and that, therefore, in consenting to engage in this work without objection, deceased assumed the risk of the employment. We are not prepared to hold that this is true as a matter of law. It appeared that the deceased was wholly unskilled in the work, and that trolley wires were new in the city of Kalamazoo. It does not appear that he knew anything about the amount of tension which the wire was sustaining, or of the probable result of cutting the wire in the manner in which he did. Furthermore, the work was done under the eye of Secord, and deceased was given no

warning. Under these circumstances, we think it was a question for the jury as to whether the danger was obvious to the deceased. It was held in *Smith v. Car Works*, 60 Mich. 501, that it cannot be presumed that a common laborer is possessed of the necessary scientific knowledge to enable him to comprehend and avoid danger. Nor do we think in the present case that it can be conclusively presumed that the deceased possessed the requisite knowledge of the facts which would lead him to believe that the wire in question was going to part with sufficient force to produce the results which it did. In *Gill v. Homrighausen*, 79 Wis. 634, it was held that where it appeared that a danger from a fragment of an overhanging arch would be apparent to a skilled and experienced mason, but was not apparent to a common laborer, who was directed to work underneath the arch, the plaintiff was entitled to recover. See *Ferren v. Railroad Co.*, *supra*.

We think the instructions to the jury were full and ample, and correctly stated the law applicable to the case.

It remains to be considered whether there was error in respect to the admission of testimony or in the charge as it related to the measure of damages.

Plaintiff called as a witness the defendant's road-master, Henry H. Houghton, who testified on direct examination to a conversation with deceased directly before the accident, and on cross-examination he was asked the question:

" Mr. Houghton, did you ever instruct Mr. Walker to cut those wires?"

This was objected to, on the ground that the question called for a conclusion. The objection was sustained, and defendant's counsel excepted. The witness was next asked:

" Will you state whether you ever stated to John Walker or requested him to cut those wires?"

This was likewise ruled out.

We think these questions were clearly competent. This was on cross-examination of a witness produced by the plaintiff, and one of the important questions in the case was whether deceased had volunteered to do this work, or whether he was acting under the direction of the witness. Whether he had been directed to do so was a fact within the knowledge of the witness, and one competent to be testified to; and while his negative statement might not have been conclusive, and the jury were entitled to construe it in connection with other testimony in the case, yet it was the right of the defendant to have an answer to the question.

It was also a question in the case as to whether the removal of this obstruction was within the line of the duties of the deceased as section boss, and the same witness was asked this question:

"How high above the top of one of the high cars would a man's lantern be when giving these signals,—an ordinary man?"

This was objected to as a conclusion, and stricken out. He was also asked:

"Are you able to state whether, if the brakeman happened to be on one of these high cars, and was required to give and did give that signal [referring to a signal which had been described to the jury], his lantern would go as high as 22 feet,—an ordinary sized man?"

This was likewise ruled out as calling for a conclusion. We think this testimony was clearly competent. *Laird v. Snyder*, 59 Mich. 404; *Marcott v. Railroad Co.*, 49 Id. 99; *Laughlin v. Railway Co.*, 62 Id. 220; *Woodbury v. City of Owosso*, 64 Id. 239; *Noble v. Railway Co.*, 98 Id. 249.

Upon the measure of damages, the circuit judge, after instructing the jury that they were at liberty to take into account the *data* furnished by the proof consisting of the earnings of the deceased and his expectancy of life, and to

determine the amount which he would probably have contributed to the family if he had lived, said:

"You are not bound to award any particular, fixed, and definite sum which is the exact product of figures based upon his expectancy of life, and the expectancy of the life of his wife, and the period of the minority of his children. These figures are given you so that you might have an intelligible basis for your computation, and not as an absolute rule which you must follow in arriving at your verdict in case you award damages to the plaintiff,"—but added: "You should, however, take these figures into account in making up your verdict, in order that you may not render a verdict for an excessive amount."

The evidence is all reported, and we find no testimony in the record which would furnish a basis for any other damages than the loss of such contributions to support as the deceased would have been able to make from his earnings. It is very evident that the jury disregarded this fact, and must have reached the result without any computation, and we are not prepared to say that they may not have construed the language quoted as authorizing them to do so. The statute (section 8314, How. Stat.) provides that—

"In every such action the jury may give such damages as they shall deem fair and just, with reference to the pecuniary injury resulting from such death to those persons who may be entitled to such damages when recovered."

This statute has been construed many times by this Court. In *Chicago & N. W. Ry. Co. v. Bayfield*, 37 Mich. 214, it was held that, in arriving at the damages, the actual pecuniary loss of the widow or next of kin should alone be considered.

In *Cooper v. Railway Co.*, 66 Mich. 271, it was said:

"Under this statute, the jury are not warranted in giving damages not founded upon the testimony or beyond the measure of compensation for the injury inflicted. They cannot give damages founded upon their fancy, or

based upon visionary estimates of probabilities or chances. The rule of damages in actions for torts does not apply to actions of this kind. The statute gives the right to damages; but it has been held, with rare exceptions, that they must be confined to those damages which are capable of being measured by a pecuniary standard."

See, also, *Mynning v. Railroad Co.*, 59 Mich. 257.[1]

We are aware that some courts have held that the jury may take into account the loss sustained by the children of the deceased for loss of physical care and mental and moral training of the father or mother; and we are not prepared to say that cases may not arise in which there may be sufficient proof of damages suffered by reason of the withdrawal of these ministrations as to justify a recovery upon that basis. But it is distinctly against the previous holdings of this Court to say that such elements may be considered, and the jury left to roam at large and draw upon their imagination as to the extent of the injury suffered through this cause.

As the case must be remanded for a new trial, it is proper to direct attention to another error assigned, which can be and should be remedied by amendment. The declaration does not set out the facts as to the existence of the wife and children of the deceased, who would be entitled to damages by reason of his death. This was a defect, under the ruling of this Court in *Hurst v. Detroit City Railway*, 84 Mich. 539, and *Charlebois v. Railroad Co.*, 91 Id. 59.

Judgment will be reversed, and a new trial ordered.

McGRATH, C. J., concurred with MONTGOMERY, J.

GRANT, J. I concur in the opinion of my Brother MONTGOMERY in the question of damages. I cannot, however, concur with him that there is any evidence in this case on which to base a charge of negligence against the

---

[1] See *Nelson v. Railway Co.*, *ante*, 582.

defendant.  Mr. Walker was a section foreman, and it was his duty to remove all obstructions from his section of the road; or, if there were any which he could not with safety remove, it was his duty to report the same to the proper officers of the defendant.  If this trolley wire was so low as to endanger the lives of brakemen upon the cars, the defendant would have been liable for any accident caused by it after notice of its existence.  I am unable to find anything in the record which can be construed into a direction to Mr. Walker on the part of Mr. Houghton to cut the wire.  Upon discovering its existence, it appears to have been clearly understood by Walker, Houghton, and Secord that the wire should be cut.  Mr. Tolchard testified that he ordered a tall car to be run under the wire.  Mr. Walker procured a stepladder from within the car, and voluntarily climbed to the top, and the stepladder was handed to him.  He seemed to assume that, as a matter of course, he was the one to cut the wire, and he did it voluntarily, without protest, objection, or suggestion of danger.  The only danger was in holding onto one end after it had been cut.  This was as apparent to one as to another.  Mr. Walker was, however, told that he must hold onto the nippers lightly, so as to let go when the wire broke.  There was no thought of danger on the part of any one, nor was there any except in holding onto the wire.  Every one present—those looking on as well as the railroad men—knew that the wire would bound back when severed, and people standing in the street so stated.  If this had been an unseen danger, of which the superior had knowledge, but the deceased had not, a different rule would apply.  No one can doubt that, if the deceased had obeyed the instructions which were given, the accident would not have happened.  No instructions were necessary, however, to guard against a patent danger.

The allegations of negligence are (1) that defendant did

not furnish a safe place in which to work; (2) that it did not furnish some one to support the stepladder; and (3) that deceased was not furnished with proper tools for cutting the wire, and was not properly instructed how to use them. The place was safe, and the ladder was used only to reach the wire and pull it down, which was safely done. These two allegations are therefore eliminated from the case, and are not argued on the part of the plaintiff. The nippers was a suitable and proper tool with which to cut the wire. The claim of the plaintiff in this regard is that the defendant should have furnished machinery with which to hold the wire solid upon each side of the place where it was to be severed; that this was the customary way on the part of street-car companies when desiring to separate it, so as not to injure the line. In other words, it must be held that the company not only should have known this method, but should have provided the deceased with the apparatus necessary to be used to avoid injury to other parts of the trolley system when severing a wire. There is no evidence that the defendant or any of its officers lawfully intrusted with the care of this part of its road had any knowledge of any such apparatus, or of its use, or that the interior of the wire was composed of soft metal. All that the defendant had to do and all that it cared about was to cut this wire, regardless of injury to the other parts of the street-railway system. I am unable to come to any other conclusion than that the sole and proximate cause of the injury was the fact that the deceased did not let go of the wire when it was severed. If there be any force in the contention that the wire parted before it was entirely severed by the nippers, in consequence of the soft metal in the center, this was a thing unseen and unknown to any one connected with the affair, and was therefore an unseen and hidden danger, for which the defendant is not liable.

Briefly stated, the situation is this: The deceased was section foreman, upon whom was the duty to keep his section of the road clear from obstructions. He voluntarily did the work. The danger, if any, was apparent. The nippers was a proper tool to cut the wire. The accident happened because he held on when the wire parted. Distressing as these accidents always are in their consequences, yet negligence must be established in accordance with sound legal principles, in order to hold the defendant liable for those consequences. Under the facts in this case, I am unable to discover any authority or sound legal principle upon which the defendant can be found guilty of negligence.

I think the judgment should be reversed, and no new trial ordered.

HOOKER, J. I agree with my brethren that the judgment must be reversed. I think it a question for the jury to determine whether this was such an extraordinary service, involving latent danger, as to impose upon the master the duty of warning the employés, if the master was aware of the danger, and whether the master was negligent in failing to discover and warn the deceased of such danger, if it existed. The liability of the defendant must rest upon the violation of a duty, viz., that of ordinary care; and this liability cannot be based simply upon the request to perform an unusual or extraordinary service. There must be reason to suppose that there is danger, of which the servant is ignorant, or that he does not possess the skill to avoid it. The character of the service, the exigency, the intelligence and skill of the servant, and the opportunities of each to ascertain the danger, enter into the question.

I think a new trial should be ordered.

LONG, J., did not sit.