STERNER *v.* MICHIGAN CENTRAL RAILROAD CO.

COMMERCE—EMPLOYEE REPAIRING LOCOMOTIVES USED IN INTERSTATE COMMERCE ENGAGED IN INTERSTATE COMMERCE—FEDERAL EMPLOYERS' LIABILITY ACT.

A pipe fitter employed to repair locomotives used in interstate commerce, who was injured while temporarily leaving his employer's grounds to get something to eat, was engaged in interstate commerce, and his remedy for said injury is therefore under the Federal employers' liability act (35 U. S. Stat. p. 65, as amended 36 U. S. Stat. p. 291) exclusively, and where action therefor was not seasonably brought under said act, verdict should have been directed in defendant's favor.[1]

Error to Cass; Warner (Glenn E.), J.    Submitted April 9, 1925.    (Docket No. 47.)    Decided June 18, 1925.

Case by Arthur C. Sterner against the Michigan Central Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed, and judgment ordered entered for defendant.

*Gore & Harvey (Frank E. Robson* and *J. W. Dohany,* of counsel), for appellant.

*Thomas J. Cavanaugh* and *Edwin J. Donahue,* for appellee.

It is the claim of plaintiff that on August 16, 1920, he received an injury to his eye on defendant's grounds at Niles, while he was in its employ and when he was going home to get something to eat, expecting to return and resume his work in about 30 minutes.    He describes his work as follows:

---

[1]Commerce, 12 C. J. § 57; Limitations of Actions, 37 C. J. § 790; Master and Servant, 26 Cyc. p. 1380 (Anno).

As to whether employee repairing rolling stock used in interstate commerce is within provisions of Federal employers' liability act, see notes in 47 L. R. A. (N. S.) 54; L. R. A. 1915C, 62.

"I was pipe fitter.    I repaired pipes on the loco-
motives as they were repaired.    I was busy there all
the time."

As to the service performed by the locomotives he
worked on he says:

"*Q.* At that terminal the locomotives come in from
the main line of the Michigan Central, do they not?
"*A.* Yes, sir.
"*Q.* And those locomotives that you were working
on were used by the Michigan Central Railroad Com-
pany hauling their trains from Niles to Chicago and
Detroit?
"*A.* The engines that I was working on was simply
being repaired for work.
"*Q.* I mean when in use they were doing this
service?
"*A.* Yes, sir; but they was used for various things.
"*Q.* And those engines were employed to move
trains from Chicago to Niles and to Detroit, were they
not?
"*A.* I presume likely they was.
"*Q.* And the terminals at Niles; the company has
a large yard there, has it not?
"*A.* Yes, sir.
"*Q.* And those locomotives would be employed in
the work of breaking them up?
"*A.* That is, the repair locomotive would.
"*Q.* Some of those trains made up would go on to
Canada and the east?
"*A.* I presume likely.
"*Q.* Most all of them had come from Chicago or
Michigan City coming into Niles from the west?
"*A.* Yes, sir.
"*Q.* Then likewise trains—were there some trains
that came into those yards from the east from New
England and Canada that were broken up in those
yards?
"*A.* Without a doubt they was.
"*Q.* And they were propelled by those locomotives
that you worked on?
"*A.* Them that was repaired, yes.
"*Q.* Now, that had been your employment from the
preceding December up to August 16, 1920, repair-
ing those locomotives—

"*A*. Yes, sir.
"*Q*. —that were used as you say?
"*A*. Yes, sir."

One of plaintiff's witnesses testified:

"I was working on engines there with Mr. Sterner. Those engines draw trains from Chicago into Indiana and elsewhere, through and out of Michigan."

And one of defendant's witnesses says:

"The business of the plaintiff in August, 1920, was a pipe fitter. A pipe fitter strips pipes off of locomotives, and jackets. His work was confined to pipe fitting mostly. And these (pipes) were on all of the locomotives of the Michigan Central Company. These locomotives were used in the Niles yard and west to Chicago, Joliet and Argo. They were also used in hauling trains and cars from Chicago and Indiana into Michigan."

This action was not brought until August 15, 1923. It was insisted by defendant that plaintiff's cause of action, if any ever existed, was under the Federal employers' liability act of April 22, 1908 (35 U. S. Stat. p. 65), as amended by the act of April 5, 1910 (36 U. S. Stat. p. 291) ; that suit was not seasonably brought under that act; and that no negligence of defendant was established. Defendant moved for a directed verdict on these grounds. The court reserved the question under the Empson act and submitted the case to the jury. He later declined to enter judgment *non obstante veredicto* and entered judgment on the verdict for plaintiff for substantial damages.

Fellows, J. (*after stating the facts*). The testimony, and we have quoted all of it on the subject, clearly establishes that plaintiff at the time he received the injury was employed repairing locomotives used in interstate commerce. If he was within the purview of the Federal act, his action was not season-

ably brought. *Bement* v. *Railway Co.,* 194 Mich. 64 (L. R. A. 1917E, 322), where the appropriate provision of the act is quoted.     If the Federal act applies, it is exclusive as the authorities we shall presently cite demonstrate.     Numerous cases involving the Federal act have been before this court.     We shall first examine some of them.     In *Gaines* v. *Railway Co.,* 181 Mich. 376, the plaintiff received his injuries while at work repairing a car used in interstate commerce.     It was held that the work plaintiff was doing when he received his injuries was a part of interstate commerce and his remedy under the Federal act, and *Pedersen* v. *Railroad Co.,* 229 U. S. 146 (33 Sup. Ct. 648, Ann. Cas. 1914C, 153), was cited.     In the *Pedersen Case* it was said:

"That the defendant was engaged in interstate commerce is conceded, and so we are only concerned with the nature of the work in which the plaintiff was employed at the time of his injury.     Among the questions which naturally arise in this connection are these:     Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it?     Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier?     The answers are obvious.     Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars, and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair.     The security, expedition and efficiency of the commerce depends in large measure upon this being done.     Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency  *  *  *  in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment' used in interstate commerce.     But, independently of the statute, we are of opinion that the work of keeping

231—Mich.—25.

such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it. The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements and the nature of each determined regardless of its relation to others or to the business as a whole. But this is an erroneous assumption. The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged? See *McCall* v. *California*, 136 U. S. 104, 109, 111 (10 Sup. Ct. 881); *Second Employers' Liability Cases*, 223 U. S. 6, 59 (32 Sup. Ct. 169, 38 L. R. A. [N. S.] 44); *Zikos* v. *Navigation Co.*, 179 Fed. 893, 897, 898; *Central R. Co. of N. J.* v. *Colasurdo*, 192 Fed. 901; *Darr* v. *Railroad Co.*, 197 Fed. 665; *Northern Pacific R. Co.* v. *Maerkl*, 198 Fed. 1. Of course, we are not here concerned with the construction of tracks, bridges, engines or cars which have not as yet become instrumentalities in such commerce, but only with work of maintaining them in proper condition after they have become such instrumentalities and during their use as such."

In *Sims* v. *Railway Co.*, 196 Mich. 114, plaintiff was engaged as an assistant car repairer in defendant's shop. This court held that under the Federal act the defense of assumed risk was available and that a verdict should have been directed on that ground. In the recent case of *Britton* v. *Railway Co.*, 230 Mich. 628, plaintiff was engaged in defendant's machine shop at Montpelier, Ohio; he worked repairing engines. It was held that he was engaged in interstate commerce and defendant was liable under the Federal act. In *Fernette* v. *Railroad Co.*, 175 Mich. 653 (on rehearing 672), the train was an intrastate train but it contained two cars carrying merchandise billed to points outside the State. It was held that this impressed an interstate character on the train and that the Federal act applied and was exclusive. In other cases in this court it has been held that employees who were not

engaged directly in the movement of interstate commerce but whose work concerned the instrumentalities necessarily a part of such movement were engaged in interstate commerce and under the Federal act. In *Collins* v. *Railroad Co.*, 193 Mich. 303, a lineman stringing wires; in *Cholerton* v. *Railway*, 199 Mich. 647, an employee in the bonding crew of an intrastate interurban road which carried interstate shipments; in *Guy* v. *Railroad Co.*, 198 Mich. 140, an employee engaged in coaling and placing water in tanks of engines engaged in interstate commerce; in *Jorgensen* v. *Railway Co.*, 189 Mich. 537, a fireman on a work train; and in *Chapman* v. *Railroad Co.*, 196 Mich. 671, an employee engaged in unloading bridge timbers.

After the decisions in *New York Cent. R. Co.* v. *Winfield*, 244 U. S. 147 (37 Sup. Ct. 546, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139), and *Erie R. Co.* v. *Winfield*, 244 U. S. 170 (37 Sup. Ct. 556, Ann. Cas. 1918B, 662), this court was called upon to determine whether our workmen's compensation act applied to employees in interstate commerce. *Carey* v. *Railway Co.*, 200 Mich. 12. Speaking for the court and having reference to the *New York Central Case*, it was said by Justice STONE:

"In other words, it was there held that, by the Federal act, congress manifested its will to cover the whole field of compensation or relief for injuries suffered by railroad employees engaged in interstate commerce, or at least the whole field of obligation of carriers relating thereto; and that it thereby withdrew the subject wholly from the domain of State action.

"The doctrine announced is that by the Federal legislation employees of an interstate railroad company are not within the purview of a State workmen's compensation act."

See, also, *Miller* v. *Railway Co.*, 201 Mich. 72; *McKenna* v. *Railroad Co.*, 202 Mich. 103.

Our decisions have, we think, quite consistently followed the rule announced in *Pedersen* v. *Railroad Co., supra,* and by them we are committed to a doctrine which prevents an affirmance of this case without overruling some at least of them, particularly the *Gaines, Sims,* and *Britton Cases.* The act being an act of congress, and a valid one (*Second Employers' Liability Cases,* 223 U. S. 1 [32 Sup. Ct. 169, 38 L. R. A. (N. S.) 44]), we should, of course, follow the decisions of the court of last resort of the nation, but we should not recede from holdings in consonance with the earlier holdings of that court unless we are clearly convinced that the rule there announced has been modified by that court or exceptions engrafted upon it which are applicable to the case in hand. Let us, therefore, take up and consider some of the decisions of the Supreme Court of the United States to determine whether it is our duty to recede from our former holdings. In *Minneapolis, etc., R. Co.* v. *Winters,* 242 U. S. 353 (37 Sup. Ct. 170, Ann. Cas. 1918B, 54), the proof as to the service of the locomotive fell far short of that contained in this record, and the paucity of proof was commented upon in the opinion. It was there held (we quote from the syllabus) :

"The injury occurred while plaintiff was repairing an engine. The engine had been used in interstate commerce before the injury and was so used afterwards, but there was nothing to show that it was permanently or specially devoted to such commerce, or assigned to it at the time. *Held,* not a case within the Federal employers' liability act."

Upon the authority of this case *Chicago, etc., R. Co.* v. *Kindlesparker,* 234 Fed. 1, was reversed (246 U. S. 657 [38 Sup. Ct. 425]). But in the *Kindlesparker Case* the repairs took 79 days and the engine was withdrawn from both intra- and interstate service

for that period of time.    The circuit court of appeals of this circuit entertained the view that this was not controlling and upon the authority of *Law* v. *Railroad Co.,* 208 Fed. 869 (L. R. A. 1915C, 17), sustained liability.    In *Industrial Commission* v. *Davis,* 259 U. S. 182 (42 Sup. Ct. 489), however, the Supreme Court did hold that time was to be considered.    In that case the engine was withdrawn from service December 19, 1918, and the repairs were not completed until February 25, 1919, and the engine was not put back into service until a week later; it had to be shipped and dismantled and it would seem was practically rebuilt.    Manifestly one employed in building or rebuilding a locomotive is no more engaged in interstate commerce than a miner engaged in mining coal which is afterwards used in interstate commerce (*Delaware, etc., R. Co.* v. *Yurkonis,* 238 U S. 439 [35 Sup. Ct. 902]), and the court so held.    Likewise an engine used in interstate commerce may be withdrawn from such service for so long a period as to lose its identity and be no longer a part of such commerce and no longer an instrumentality of it.    These three cases tend more strongly to sustain plaintiff's contention than any others which have been called to our attention or which we have been able to find.    They are, we think, distinguishable from the case made by this record.    Other cases should, however, be considered.    In *Illinois Cent. R. Co.* v. *Behrens,* 233 U. S. 473 (34 Sup. Ct. 646, Ann. Cas. 1914C, 163), the employee was engaged in switching intrastate cars onto various tracks in the city. The railroad was an interstate carrier but the work being performed was purely intrastate.    Liability under the Federal act was denied.    In *Shanks* v. *Railroad Co.,* 239 U. S. 556 (36 Sup. Ct. 188, L. R. A. 1916C, 797), an employee was injured while taking down and putting up fixtures in a repair shop.    It

was held that he was not engaged in interstate commerce. In *Chicago, etc., R. Co.* v. *Harrington,* 241 U. S. 177 (36 Sup. Ct. 517), the employee was moving coal from storage tracks to coal shutes where it was to be used later in interstate commerce. Liability under the Federal act was denied because he was not engaged in interstate commerce as he was doing "nothing more than putting the coal in a convenient place from which it could be taken as required for use." But in *Philadelphia & Reading R. Co.* v. *Hancock,* 253 U. S. 284 (40 Sup. Ct. 512), where a car of coal was moving from the mine to the yard where it was to be weighed and billed to destination in another State, it was held that it was a part of an interstate movement and liability under the Federal act was sustained. In *North Carolina R. Co.* v. *Zachary,* 232 U. S. 248 (34 Sup. Ct. 305, Ann. Cas. 1914C, 159), in sustaining liability under the Federal act, it was said:

"It is argued that because, so far as appears, deceased had not previously participated in any movement of interstate freight, and the through cars had not as yet been attached to his engine, his employment in interstate commerce was still *in futuro.* It seems to us, however, that his acts in inspecting, oiling, firing, and preparing his engine for the trip to Selma were acts performed as a part of interstate commerce, and the circumstance that the interstate freight cars had not as yet been coupled up is legally insignificant."

And the *Pedersen Case* was cited.

In *Philadelphia & Reading R. Co.* v. *DiDonato,* 256 U. S. 327 (41 Sup. Ct. 516), a watchman at a railroad crossing was held to be engaged in interstate commerce and that it was unimportant whether he was flagging an interstate or intrastate train when the accident occurred. In *Philadelphia, etc., R. Co.* v. *Smith,* 250 U. S. 101 (39 Sup. Ct. 396), an employee

who did the cooking and made the beds for a gang of bridge carpenters was held to be engaged in interstate commerce within the meaning of the Federal act. Likewise the act was held to apply in *Erie R. Co.* v. *Collins,* 253 U. S. 77 (40 Sup. Ct. 450), where the employee attended the signal tower and switches and operated a gasoline engine in pumping water for the engines; in *Erie R. Co.* v. *Szary,* 253 U. S. 86 (40 Sup. Ct. 454), where the employee was engaged in drying sand for use in engines, both interstate and intrastate; in *Louisville, etc., R. Co.* v. *Parker,* 242 U. S. 13 (37 Sup. Ct. 4), where the accident occurred while moving an intrastate car, but there was some testimony that the ultimate movement contemplated reaching an interstate car, and in *New York Cent. R.* v. *Carr,* 238 U. S. 260 (35 Sup. Ct. 780), where the employee was injured while on an intrastate car, but where the movement was to cut out cars of an interstate train.

We shall not discuss cases cited from State courts other than our own, although they have been examined. Nor shall we discuss the divergent views of the several Federal circuit courts of appeal. One of such decisions, that in *Northern Pacific R. Co.* v. *Maerkl,* 198 Fed. 1, which has been cited with approval by the Supreme Court, should be noted. In that case it was said:

"It is equally plain, we think, that those engaged in the repair of such a car are as much engaged in interstate commerce as the switchman who turns the switch that passes the car from the repair shop to the main track to resume its place in the company's system of traffic, or any of the operatives who thereafter handle it in such traffic."

An examination of the authorities is not persuasive that we should recede from our former holdings. Locomotives are a part and an indispensable part in

the movement of interstate commerce, they are an instrumentality and an important instrumentality in such movement, as important as the bridges and roadbed.     Not only does every consideration of public safety demand that they be kept in repair, but the express mandate of congress so requires (36 U. S. Stat. p. 913, as amended, 38 U. S. Stat. p. 1192).     These repairs may be so extensive as to temporarily take them out of service in such commerce and they may be so minor as to require but a few hours of attention.     Plaintiff was employed in such repair work, both large and small.     Upon this record we hold he was engaged in the work of interstate commerce and the remedy afforded by the Federal act was exclusive.     It was unimportant that he was temporarily leaving defendant's grounds to get something to eat.     *North Carolina R. Co.* v. *Zachary, supra; Erie R. Co.* v. *Winfield, supra.*

It follows that the judgment must be reversed and the case remanded with directions to enter judgment for defendant *non obstante veredicto.*

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, and STEERE, JJ., concurred.     WIEST, J., concurred in the result.